**Darrell W. BAILEY, Plaintiff-Appellant,**

v.

**M.C. HAMBY, Warden, State of Tennessee, Defendant-Appellee.**

**No. 84–5161.**

United States Court of Appeals, Sixth Circuit.

July 31, 1984.

Decided Sept. 20, 1984.

Rehearing and Rehearing En Banc Denied Nov. 9, 1984.

Jay W. Bouldin, Jonesboro, Ga., for plaintiff-appellant.

William M. Leech, Atty. Gen., Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, Tenn., for defendant-appellee.

Before KEITH and MARTIN, Circuit Judges, and SILER, District Judge.[*]

BOYCE F. MARTIN, Jr., Circuit Judge.

Darrell Bailey appeals the denial of his petition for a writ of habeas corpus. Bailey and codefendant Darryl Langley were convicted by a Tennessee jury of attempting to murder Gary Paxton, a relatively well-known, country-music composer and producer. Bailey argues that his conviction was based, in part, on a statement obtained in violation of his *Miranda* rights.

Bailey and Langley were allegedly hired by country-singer Vern Gosden to "beat up" Paxton. Gosden was apparently unhappy because of his business dealings with Paxton. Bailey and Langley went to Paxton's house in the early evening of December 29, 1981. After getting Paxton outside with a fabricated story about car trouble, they attacked him in his van. In the ensuing struggle, both Paxton and Langley were shot. Bailey managed to escape unharmed and fled to Georgia. He was later apprehended and returned to Nashville for trial. During the trial, a police officer testified about inculpatory statements made to him by Bailey in an interview shortly after Bailey's arrest in Georgia. The admission of these statements into evidence was affirmed by the Tennessee Court of Criminal Appeals.

Here, Bailey makes two arguments. First, he contends that he was not adequately informed of his *Miranda* rights prior to his interrogation. To support this argument, Bailey relies on a tape recording of his statement as well as on a conflict in testimony between Detectives Jones and McDerman, the two officers who interrogated him.

■ Bailey was interviewed in the Clayton County Jail library in Jonesboro, Georgia. The entire interview was tape recorded. The tape indicates that Detective McDerman began the interrogation by introducing himself and Detective Jones and then reciting the *Miranda* warnings. The warnings given, however, were incomplete. Bailey was told that he had a right to remain silent, and to have a lawyer present during questioning, but he was not told that anything he did say could and would be used against him or that if he could not afford a lawyer, one would be provided for him at government expense. *See Miranda v. Arizona*, 384 U.S. 436, 444, 473, 86 S.Ct. 1602, 1612, 1627, 16 L.Ed.2d 694 (1966).

The state of Tennessee, however, argues that there was no error here because Bailey was given his full Miranda rights prior to the interview. Detective Jones testified that he read Bailey his rights from a special card while standing just outside the library door on the jail's second floor. However, Bailey points out that Jones' testimony is in conflict with that given by Detective McDerman during the pretrial

---

[*] Honorable Eugene E. Siler, Jr., United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation.

hearing on Bailey's motion to suppress his statement. There, McDerman testified that Jones read Bailey his rights on the first floor as they stood by the elevator waiting to go up to the library. This conflict, argues Bailey, in combination with the fact that the tape recording begins with Detective McDerman introducing himself and Detective Jones to Bailey as if they had never met before, makes it highly unlikely that he was ever given his due under *Miranda.*

■ The question of whether a suspect was properly informed of his *Miranda* rights is a strictly factual one, and the decision by the state court on the matter is entitled to a great deal of deference in a habeas proceeding. *Sumner v. Mata,* 449 U.S. 815, 101 S.Ct. 64, 66 L.Ed.2d 17 (1980); 28 U.S.C. § 2254(a). While we might reach a different conclusion on the *Miranda* warnings issue, we cannot say that the trial court's determination that they were properly given is unsupported by the record or clearly erroneous. Accordingly, we find no merit to this claim.

Bailey's second argument is that the police officers did not cease their interrogation of him following his request for counsel, as required by *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The tape recording indicates that, approximately five minutes into his interrogation, Bailey made the following statement: "It ain't all me but I just don't want, you know, *I'd like to talk to an attorney* or something like that. I just don't want to get everything throwed off on me, you know things can be twisted and turned around." (emphasis added) Detective McDerman did not even acknowledge this request but simply continued the interrogation.

■ The government argues, and the state trial court found, that Bailey's statement did not constitute a request for counsel and so McDerman was not required to stop his questioning. The question of whether someone has made a request for counsel could be considered a strictly factual inquiry and so reviewable under the lib-

eral *Sumner v. Mata* standard. However, in our view, it is more properly considered a mixed question of law and fact, much as the decision to waive a constitutional right, and so judged according to a federal standard and not that of *Sumner.* See *Marshall v. Lonberger,* 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969). In any event, it does not matter which standard we apply because the trial court's decision in this case cannot withstand either level of scrutiny. The trial judge specifically found that Bailey had "never once" asked for an opportunity to speak to counsel. In so doing, the trial judge quoted from notes made while listening to the tape of the interview to the effect that Bailey only said "I ain't had no time to talk to an attorney" and "But I ain't got to talk to any attorney or anything like that." Clearly, as our own direct quotation from the transcript shows (and the government's brief acknowledges), the trial judge was simply wrong in his reconstruction of what Bailey said. Because there is no support in the record for the trial court's holding, we do not find it controlling. Our own analysis of his statement convinces us that it is adequate on its face to put the government on notice that he wanted to talk to a lawyer ("I'd like to talk to an attorney"). Our holding is consistent with our decision in *Maglio v. Jago,* 580 F.2d 202, 206 (6th Cir.1978), wherein we found that the defendant's statement that "maybe we ought to have one [an attorney]" was sufficient to invoke the right to counsel.

■ The state of Tennessee next argues that even if Bailey did invoke his right to counsel, his subsequent actions constituted a waiver of that right. Before responding to the contention, we note that the per se rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), namely that once the right to counsel is invoked, there can be no waiver except on the suspect's own initiative, is not controlling in this case. The interrogation at issue took place in January, 1981 and *Ed-*

*wards* was not decided until May, 1981. In the recent decision of *Solem v. Stumes,* — U.S. ——, 104 S.Ct. 1338, 1345, 79 L.Ed.2d 579 (1984), the Supreme Court held that *Edwards* was not retroactively applicable on collateral review of final convictions. The case law which does control our analysis is that which was in effect in this Circuit at the time the interrogation took place. *Id.* 104 S.Ct. at 1346. As of January 1, 1981, the lead case in this Circuit on invocation of the right to counsel during custodial interrogation was *Maglio v. Jago,* 580 F.2d 202 (6th Cir.1978).

■ Proceeding to the merits of the waiver issue, we note that Detective McDerman's response to Bailey's invocation of his right to counsel was simply to continue the interrogation.

> Q. All I'm wanting is you to point me in the right direction. You know, right now all I got is you cause that's what he [codefendant Langley] is telling me. Everything is you. You can't prove this. And you shot him. And you done everything. You know, he don't know even why he was there.
>
> A. Well, I can prove that he come down here and just like I said.
>
> Q. Well, tell me how you can do that cause I have to go check on it.

And so it went. In *Maglio,* this court recognized that when "a suspect requests to have counsel present during questioning, but the police ignore the request and continue questioning until he finally confesses, … a knowing waiver is very difficult, if not impossible, to establish." *Id.* at 206, quoting from *Government of Canal Zone v. Gomez,* 566 F.2d 1289, 1291 (5th Cir. 1978). The state of Tennessee has provided no evidence to meet this difficult task. In fact, a review of the tape shows that Bailey reaffirmed his desire to talk to an attorney on several more occasions during his interrogation, making the likelihood of a knowing and intentional waiver even less.[1]

The state next argues that its failure to honor Bailey's request for counsel was irrelevant because Bailey had already made the incriminating statements used against him at trial prior to making his request for a lawyer. This is the same rationale used by the Tennessee Court of Criminal Appeals. Once again, however, the state's argument is clearly not supported by the record. A review of the tape shows that, prior to his request for counsel, Bailey did admit to going to Nashville with Langley on the promise of $200 for helping Langley "beat somebody up." All this was testified to by Detective Jones at the trial. However, Jones went on to say that Bailey also described in detail the trip to Nashville, how the assault took place, and how he wrestled Paxton's gun from him and then shot twice at Paxton. All of this information came out *after* Bailey asked for an attorney.

Accordingly, we find that Bailey properly invoked his right to counsel, did not subsequently waive that right, and, as a result, made a confession which was used against him in violation of his fifth amendment rights. Nevertheless, this is not the end of our inquiry. We must now consider whether the improper admission of Bailey's confession amounted to harmless error. *See, e.g., Young v. Rees,* 707 F.2d 935 (6th Cir. 1983). We conclude that it did.

■ The crux of the government's case against Bailey was the testimony of the

---

1. The state cites several Ninth Circuit cases for the proposition that even after a request for counsel has been made, the police may present incriminating evidence to the suspect so long as they don't actually continue the interrogation. *See Pierce v. Cardwell,* 572 F.2d 1339, 1341 (9th Cir.1978); *United States v. Pheaster,* 544 F.2d 353, 368 (9th Cir.1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). We doubt that this was ever the law in this Circuit. Even if it were, it is clear in this case that the police did not simply present new evidence. There was never a break in the questioning ("all I'm wanting is you to point me in the right direction"), and the only evidence that Detective McDerman referred to was the same thing he had been referring to all along, namely that Langley was "putting the heat on you" so it was time for Bailey to give his version.

victim, Gary Paxton. Paxton testified at length about the circumstances of his assault and was able to identify with a great deal of confidence his assailants. Because Paxton had five or ten minutes in which to view his assailants before the assault occurred, his identification was a credible one. The state also introduced testimony from a bartender who saw both Bailey and codefendant Langley in Nashville the afternoon of the assault. Bailey's statement, by contrast, constituted a very small part of the evidence. The tape itself was never introduced. Instead Detective Jones simply testified as to what Bailey had said during the interview. What follows is the transcript of that testimony:

Q. Now, did you ask Mr. Bailey about whether he had been involved in the shooting of Mr. Paxton?

A. Yes, sir, we did.

Q. What, if any, response did he make to that?

. . . .

A. Mr. Bailey stated that he had been offered a certain amount of money, $200—

Q. Two hundred dollars?

A. Yes, sir. To come to Nashville to beat up a certain party, Mr. Paxton being that party. He went into quite a few details about coming to Nashville, about finding Mr. Paxton's house. Then he went into detail about how the assault started and took place.

Q. Did you question him about Mr. Paxton being shot?

A. Yes, sir, I did.

Q. What, if anything, did Mr. Bailey respond to that question?

A. He stated that during the scuffle with Mr. Paxton, he wrestled the gun from Mr. Paxton and shot him—shot at or him—twice.

. . . .

Q. Did you, without quoting what he said—did he respond to you about what route he took after Mr. Paxton had been shot.

. . . .

A. Yes, sir, he did.

The only part of this testimony of any consequence that was not properly admissible was his statement that Bailey admitted firing two shots at Mr. Paxton after a scuffle. Given that the jury properly had before it evidence that Bailey had admitted going to Nashville with Langley to beat up Paxton, that he was seen in Nashville on the day of the assault, and that Paxton identified him as the person who assaulted and shot him, we are convinced that Bailey was not prejudiced by the testimony that he admitted firing two shots at Paxton.

Accordingly, the decision of the district court is affirmed.